KATHLEEN J. KRAMER, APPELLEE AND CROSS-APPELLANT, V. KENNETH J. KRAMER, APPELLANT AND CROSS-APPELLEE.

510 N.W.2d 351

Filed April 6, 1993. No. A-91-155.

Robert J. Hovey, P.C., for appellant.

Peter C. Bataillon, of Sodoro, Daly & Sodoro, for appellee.

SIEVERS, Chief Judge, and CONNOLLY and WRIGHT, Judges.

SIEVERS, Chief Judge.

This appeal involves the amount of alimony payable by Kenneth J. Kramer to his former wife, Kathleen J. Kramer, as well as whether the trial court correctly used alimony as the proper vehicle by which to divide Kenneth's military pension. In Kenneth's appeal, he claims the trial court erred in awarding too much alimony and also in awarding attorney fees. In Kathleen's cross-appeal, she claims the trial court improperly handled her interest in Kenneth's military pension.

The parties were married August 24, 1965, and their two children are both emancipated. At the time of the trial in May 1990, Kenneth was 47 years of age and employed as a software engineer with TRW in Bellevue, Nebraska, earning a gross annual salary of approximately $57,148, based on the biweekly figures provided in the record. Kenneth had previously served in the Air Force from June 1962 to June 1984. As a result, he was also receiving military retirement benefits in a gross amount of $1,620 per month, with a net of $1,344.46.

Kathleen was also 47 years of age at the time of the trial. She did not work outside of the family home until 1981, when she began a series of jobs in the mental health field, including part-time and volunteer work. In her last full year of employment, 1989, she worked for Richard Young Psychiatric Hospital, earning a gross amount of $7,337.92. At the time of the trial, Kathleen said she was enrolled at Metro Community College in a paralegal program and was hoping to graduate at the end of 1991. She projected an earning capacity in this field of $18,000 to $24,000 per annum. Although during the marriage Kathleen had acquired nearly all of the required credits for a bachelor's degree in psychology, she indicated that it was a "very difficult and a very hard field to work in" and that now she desired a career change into paralegal work.

The trial court made two separate awards of alimony. The first is what might be called traditional alimony and involved an

award of $1,200 per month for 1 year, to be automatically reduced to $900 per month thereafter. This alimony was only terminable upon the death of either Kathleen or Kenneth or upon the remarriage of Kathleen. Kenneth contends that the traditional alimony award is too much for too long.

The second award of alimony dealt with Kathleen's interest in Kenneth's military pension. Although the trial court awarded Kenneth all rights and entitlement to his military retirement pension, it proceeded to award additional alimony to Kathleen in the nature of that approved in *Pyke v. Pyke*, 212 Neb. 114, 321 N.W.2d 906 (1982), where the Nebraska Supreme Court held that a husband's military retirement could be considered as a fund available to the husband from which to pay alimony. However, *Pyke* was decided under the direction of *McCarty v. McCarty*, 453 U.S. 210, 101 S. Ct. 2728, 69 L. Ed. 2d 589 (1981), and before the adoption in 1982 of the Uniformed Services Former Spouses' Protection Act, 10 U.S.C. § 1401 et seq. (1988 & Supp. II 1990) (USFSPA). The USFSPA permitted state courts to once again award a husband or wife an interest in his or her spouse's military pension, thereby superseding *McCarty*, which had held that federal law precluded a state court from awarding a nonmilitary spouse a portion of the military spouse's pension. The net result in Nebraska was that the enactment of the USFSPA effectively returned the military pension to its status as a marital asset subject to division under Neb. Rev. Stat. § 42-366 (Reissue 1988).

In this case, however, the trial court's order provided that Kenneth would pay Kathleen $750 per month until the death of either party, but made it a modifiable award by stating:

> [T]his award of alimony is not to terminate automatically upon the remarriage of the Petitioner. This alimony may be modified upon a change of circumstances to be considered by the court at some future date, together with any other relevant circumstances in regard to the earning capacity of either of the parties.
>
> That in consideration of the provision, Respondent is awarded all rights and entitlement to his United States Air Force Military Retirement Pension.

The standard of review in an appeal involving an action for

dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial court. In the absence of an abuse of discretion, the judgment will be affirmed. *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990).

Neb. Rev. Stat. § 42-365 (Reissue 1988) provides that alimony may be ordered

> as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

The Supreme Court in *Gleason v. Gleason*, 218 Neb. 629, 357 N.W.2d 465 (1984), held that the ultimate test for determining appropriate alimony is reasonableness. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Ritz v. Ritz*, 229 Neb. 859, 429 N.W.2d 707 (1988).

We first turn our attention to the traditional alimony of $1,200 per month for 1 year followed by $900 per month until the death of either party or remarriage of Kathleen. This alimony is in essence a lifetime award, unless Kathleen remarries. Given modern life expectancies, Kenneth could quite likely pay Kathleen alimony for 25 years or more (longer than they were married), if he lives a normal life expectancy and she does not remarry. In *Ritter*, the court stated that in addition to the statutory criteria listed in § 42-365, the income and earning capacity of each party, as well as the general equities of the situation, must be considered.

In the circumstances present here, Kathleen acquired virtually all of the credits toward a bachelor's degree in psychology during the marriage and had considerable work experience, albeit not great income, during the marriage. She

appears to be well launched toward a second career as a paralegal, and she has no minor children to care for, which would otherwise operate as an impediment upon her ability to work. Fortunately, she is not incapacitated in any way. Nonetheless, excluding consideration of the military pension and its proper division, the earning capacities of the parties are still quite disparate. At the time of the trial, Kenneth's gross income from TRW was approximately $57,148 per year, and assuming Kathleen becomes employed as a paralegal at her maximum estimated salary of $24,000, she would still be earning only 42 percent of Kenneth's salary. Thus, although we do not attempt to equalize earnings, we must examine income and earning capacity under *Ritter*, and having done so, we believe alimony is clearly appropriate in this situation. However, it should not extend beyond a reasonable period of time, and certainly not into Kenneth's retirement, when his earnings will obviously be substantially reduced. Although we believe the amount of monthly alimony awarded is appropriate, we do not believe a lifetime award of alimony, terminating only if Kathleen remarries, is appropriate. In our view, there is no tenable reason shown by this record to require Kenneth to potentially pay alimony through his sixties and perhaps well into his seventies or eighties. Accordingly, we affirm the award of traditional alimony found in paragraph III of the court's decree, except that it shall be modified to provide that alimony shall continue to be paid on the first day of each month after June 1, 1990, in the amount of $900 per month "until the death of the petitioner or the respondent, or upon the remarriage of the petitioner, or until June 1, 2005." This is 15 years of alimony, and when it terminates, both parties will be 62 years of age, unless it is previously terminated by the death of either party or Kathleen's remarriage.

Kathleen's cross-appeal is based upon the use of *Pyke* alimony to deal with Kenneth's military pension, which at the time of trial was $1,620 per month, or $19,440 per annum. Kathleen was married to Kenneth 19 of the 22 years that he served in the Air Force. The trial court's award of *Pyke* alimony is equal to 46 percent of the monthly pension payment, which takes into account the increase in January 1990 from $1,547 per

month to $1,620 per month, but does not and will not take into account future increases. Expert testimony adduced by Kathleen established the value of the military pension at between $181,725 and $261,206.

Section 42-366 provides that pension and retirement plans are to be included in the marital estate. In 1982, Congress enacted the USFSPA, and the Nebraska Supreme Court thereafter held in *Taylor v. Taylor*, 217 Neb. 409, 413, 348 N.W.2d 887, 889 (1984), that "nondisability military pensions need no longer be treated differently than nonmilitary pensions" in the division of marital assets. In *Taylor*, the court awarded the military pension to the husband, but changed an award of $300 per month in alimony for 60 months to a lifetime award. The court found that considering the military pension as a fund from which to pay alimony was acceptable, citing *Kullbom v. Kullbom*, 209 Neb. 145, 306 N.W.2d 844 (1981). The *Taylor* court also recognized that alimony and distribution of property rights have different purposes, but may be considered together to reach an award which is just and equitable.

In this marriage, the greatest accumulation of value in the marital estate is in the form of the military pension, and it is no longer to be treated differently merely because it is a military pension. The cash value of Kathleen and Kenneth's life insurance policies, various IRA's, savings accounts, government bonds, and equity in their home totaled approximately $49,011. However, after the deduction of debts assigned to each party, Kenneth's property division equaled $14,276, and Kathleen's equaled $26,224. Thus, although Kathleen received $12,000 more in other property-division assets, that amount is rather inconsequential when compared to the value of the military pension. In our view, the provision in the Nebraska statute, § 42-366, that pensions be treated as property subject to division, coupled with the USFSPA, means that as a general proposition, a military pension must be viewed primarily as property to be divided. Thus, although *Pyke* alimony can be used, it should not be used in a manner which deprives the receiving spouse of the benefits which would ordinarily inure from the division of property. Typically, when

marital property is divided, each party has the benefit of receiving a fixed amount or value which potentially can appreciate. Additionally, each party's share is not subject to being later reduced or taken away entirely because of circumstances which occur in the life of the former spouse.

In the case at hand, Kathleen's portion of the military pension is fixed at a dollar amount rather than a percentage. Thus, it is only Kenneth who receives the benefit of future increases in value of this asset, which is to be considered part of the marital estate under § 42-366. Additionally, as presently structured, the *Pyke* alimony is modifiable upon a change of circumstances, including consideration of "the earning capacity of either of the parties."

In contrast, if Kenneth and Kathleen were dividing 1,000 shares of A.B.C. Corp. common stock, they each would receive the benefit of future appreciation in value of that stock in proportion to the percentage of shares they each received at the outset. Furthermore, once the A.B.C. Corp. stock was divided, Kathleen would not have to give any of her shares back to Kenneth 10 or 15 years after the divorce if Kenneth suffered ill health, adverse economic circumstances, or some other material change in circumstances. Both parties would have received their share of the stock as their separate property, irrespective of what might happen in the future to their former spouse or to that spouse's earnings.

Nontraditional alimony was used by the trial court in Iowa to divide a husband's pension plan. The Iowa Court of Appeals denied the husband's request that the monthly payments terminate upon the wife's remarriage or cohabitation, pointing out the distinction that "[s]ince pension benefits are treated as marital property such awards are not modifiable." *In re Marriage of Wilson*, 449 N.W.2d 890, 893 (Iowa App. 1989).

We believe that the intent of Nebraska law with respect to pensions is to treat them as marital property, much like our hypothetical 1,000 shares of A.B.C. Corp. stock would be treated, and the fact that a pension is a military pension should be a fact of little consequence. *Pyke* alimony, as awarded by the trial court in this case, accords military pensions substantially different treatment, with potentially great adverse

consequences to Kathleen. We believe that in order to justify the abrogation of the typical benefits of property division (certainty of amount, the chance for future appreciation of one's share, and complete ownership) by utilizing *Pyke* alimony to divide a military pension, the record must establish a compelling need to do so. When there is no such showing, as is the case here, the ultimate test of reasonableness from *Gleason v. Gleason*, 218 Neb. 629, 357 N.W.2d 465 (1984), is frustrated, as is the holding of *Taylor v. Taylor*, 217 Neb. 409, 348 N.W.2d 887 (1984), that military and nonmilitary pensions are no longer to be treated differently when dividing marital assets. Furthermore, § 42-365 tells us that when a court is dividing marital assets, property division and alimony "serve different purposes and are to be considered separately. The purpose of a property division is to distribute the marital assets equitably between the parties."

For these reasons, we hold that the trial court abused its discretion in awarding Kathleen $750 per month in *Pyke* alimony in lieu of an outright interest in Kenneth's military pension, as Kathleen was deprived of a fair and equitable result with respect to the division of the military pension. Therefore, we reverse paragraph II, dealing with the military pension, of the decree of dissolution and remand this matter to the district court for Sarpy County with directions to award Kathleen 46 percent of Kenneth's military pension under § 1408, which award shall not be subject to modification.

On cross-appeal, Kathleen also raises the question of security on her pension interest. Kathleen normally would not lose her share of the marital property which was divided in the divorce should Kenneth meet an early death. However, should that happen in this instance, the *Pyke* alimony awarded by the trial court would terminate, clearly depriving Kathleen of a just and equitable result, as she would be deprived of one of the most valuable attributes of complete ownership of property. This is so because the trial court did not require security of any sort for Kathleen's interest in the military pension in the event of Kenneth's premature death. Should that happen, her interest in the most important material asset of the marriage would simply evaporate. The basic statute dealing with property division and

alimony, § 42-365, provides that "[r]easonable security for payment may be required by the court."

Federal law provides for the termination of military pension benefits upon the death of the member, which will be the case here even after Kathleen is awarded 46 percent of the military pension pursuant to our decision. However, benefits can continue to be paid to a beneficiary, including a former spouse, if the member purchases the Survivor Benefit Plan. § 1448. Kenneth continued to purchase the Survivor Benefit Plan after the separation from Kathleen and at least up to the time of trial. He could have been ordered by the trial court to name Kathleen the beneficiary under the plan, pursuant to § 1450(f)(4), which would generally mean that Kathleen would receive 55 percent of Kenneth's pension if she was under age 62 at the time of his death and, if older, then 35 percent. See § 1451. Requiring such security by use of the Survivor Benefit Plan gives the division of a nondisability military pension more of the attributes of true property division, which as we have said, it should have, unless compelling circumstances, not present here, are shown to justify the markedly different treatment inherent in the use of *Pyke* alimony. Therefore, on remand, Kenneth should be ordered to maintain his Survivor Benefit Plan, naming Kathleen as beneficiary, as permitted by § 1450(f)(4).

The final issue we address is Kenneth's claim that the trial court erred in awarding $3,000 in attorney fees for the benefit of Kathleen's counsel. In *Ritchie v. Ritchie*, 226 Neb. 623, 627, 413 N.W.2d 635, 638 (1987), the Nebraska Supreme Court stated that an award of attorney fees depends

> on a variety of factors, including the nature of the case, the amount of property divided and alimony awarded, the earning capacity of the parties, the services performed and results obtained, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case.

In *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990), it was held that the award of attorney fees in a marital dissolution proceeding was a matter within the trial court's discretion, which award is reviewed de novo on the record and affirmed in the absence of an abuse of discretion.

Having reviewed the record in this matter, it is clear to us that there was no abuse of discretion in the award of attorney fees, and, therefore, Kenneth's assignment of error in that regard is without merit. Because of the result ordered in this appeal, no attorney fees are awarded in this court, but costs are taxed to Kenneth.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.